IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TRACIE HALL, | ) | CASE NO.  4:13-CV-637 |
| *o/b/o* A.H. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | MEMORANDUM OPINION & ORDER |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties.  (Doc. 16).

The issue before the undersigned is whether the final decision of the Commissioner of Social

Security  (the "Commissioner") denying Tracie Hall's ("Plaintiff" or "Hall") application for

Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C.

§1381 *et seq*., on behalf of A.H., is supported by substantial evidence and therefore, conclusive.

For the reasons set forth below, the undersigned AFFIRMS the Commissioner's decision.

## I.      INTRODUCTION & PROCEDURAL HISTORY

On August 25, 2009, Plaintiff filed an application for Supplemental Security Income

benefits on behalf of A.H. with a protected filing date of August 14, 2009. (Tr. 95-98).  Hall

alleged A.H. became disabled on December 30, 1997, due to suffering from a learning disability

and speech problems. (Tr. 95, 196).  The Social Security Administration denied the application

initially and upon reconsideration. (Tr. 58, 66).  Thereafter, Hall was granted a hearing before an

administrative law judge ("ALJ") to contest the denial.  (Tr. 73, 76).

On June 7, 2011, Administrative Law Judge Dwight Wilkerson convened a hearing to

evaluate the application. (Tr. 33-53).  Along with counsel, Plaintiff and A.H. appeared before the

ALJ. (*Id.*).  On July 21, 2011, the ALJ issued an unfavorable decision denying Plaintiff's request for benefits. (Tr. 13-27).  Subsequently, Hall sought review of the ALJ's decision from the Appeals Council.  (Tr. 9).  The council denied Plaintiff's request, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4). Plaintiff now seeks judicial review of the Commissioner's denial pursuant to 42 U.S.C. § 1383(c).

## II.     EVIDENCE

### A.  Personal Evidence and Parent Reports

A.H. was born on December 30, 1997, and was 11 years old on the date the application was filed and 13 years old at the time the ALJ issued his opinion. (Tr. 73).  Accordingly, A.H. was a "school-age child" at the time the application was filed and an "adolescent" when the ALJ rendered his decision. *See* 20 C.F.R. 416.926a(g)(2)(iv)-(v).

Hall, A.H.'s mother, reported that A.H. was able to getting ready for school in the morning each day without issue. (Tr. 208).  A.H. was assigned daily chores at home, like keeping her room clean, but she sometimes became angry when instructed to perform her chores. (Tr. 209).  A.H. could watch a television program from beginning to end and recount what occurred during the show. (*Id.*).  Hall also indicated that A.H. completed her homework, but needed frequent reminders to do it. (Tr. 190).  When A.H. had trouble with certain parts of homework, her father would help. (Tr. 44).  Hall testified that A.H. would read books at home, and could understand simpler books, geared more toward her age level. (Tr. 45, 51).  She also indicated that A.H. had recently shown improvements in school and made the honor roll. (Tr. 43).

### B.  Educational Evidence

In kindergarten A.H. was found eligible for special education services due to cognitive disabilities and speech and language deficits. (Tr. 125).  After repeating kindergarten, A.H. remained enrolled in some special education classes throughout the period at issue. (Tr. 43, 125).

In March 2008 when A.H. was in the third grade, her Individualized Education Plan ("IEP") was re-assessed. (Tr. 126-36).  The report indicated that A.H had shown significant progress in her oral expression skills. (Tr. 129).  The evaluator opined that A.H. should continue speech therapy to reduce the nasal production of certain sounds. (*Id.*).  As part of the re-evaluation, A.H. underwent a WISC-IV intellectual functioning test in April 2008. (Tr. 131).  A.H. had a verbal comprehension score of 53 and a full scale IQ score of 60.  School psychologist Deborah Bjelac indicated that the two scores fell into the extremely low range. (*Id.*).  The psychologist opined that A.H.'s basic skill knowledge had increased since her initial 2005 evaluation, but her cognitive functioning was significantly impaired and she still required individualized instruction and significant modification to the general curriculum. (Tr. 131-32).

In May 2008, Marjorie L. Speaker, A.H.'s intervention specialist and teacher, assessed A.H.'s classroom performance. (Tr. 176).  She indicated that A.H. read on a guided reading level, but when she choose to, A.H. could work close to grade level.  Ms. Speaker opined that A.H.'s strength could be spelling, when she studied.  She also explained that when A.H. was "made to do work," she could become stubborn and shut down.  Ms. Speaker described A.H. as a nice girl to have in class, but that she was immature for her age and acted as though being "silly and cute" would get her through class. (*Id.*).

On October 6, 2009, when A.H. was in the fifth grade, Ms. Speaker completed a Teacher Questionnaire. (Tr. 114-21).  Ms. Speaker indicated she had known A.H. since kindergarten, and

she currently worked with A.H. daily for math, spelling, English, and reading. (Tr. 114).  In the domain of acquiring and using information, Ms. Speaker opined that A.H. had a "serious problem" in expressing ideas in written form, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. (Tr. 115).[1] For all other activities in this domain, Ms. Speaker found A.H. had an "obvious problem."  Ms. Speaker denoted no "very serious problems" under this domain. (Tr. 116).  Regarding A.H's ability to acquire and use information, the teacher further elaborated that A.H. "usually needs extra time to learn new things and concepts.  She works well with small groups and where she can work with hands-on materials.  [A.H.] also needs constant review to remember what she has learned.  She needs one-step-at-a-time directions and problems." (Tr. 115).

In March 2010, A.H.'s speech and language abilities were reevaluated. (Tr. 103).  A.H. had been enrolled in speech therapy for thirty minutes per week since at least April 2008. (*Id.*). Speech pathologist Marisa Termine indicated that A.H.'s speech articulation had improved to 98%, and her communication scores were commensurate with her intellectual abilities. (Tr. 104).

On March 10, 2010, Sylvia Sisko, A.H.'s math teacher and intervention specialist, completed a Teacher Questionnaire. (Tr. 149-56).  At the time, Ms. Sisko had known A.H. for six months. (Tr. 149).   In acquiring and using information, Ms. Sisko indicated that A.H. had "a very serious problem" for all activities listed. (Tr. 150).  The teacher also wrote, "[A.H.] needs constant instructions, re-teaching, and guidance.  Retention of materials is extremely poor.  She lacks understanding of basic math concepts.  She is functioning far below same age peers.  Low cognitive ability adversely affects all areas of academic functionality." (*Id.*).

---

[1] The rating key for activities listed on the Teacher's Questionnaire Form rated a child's ability on a scale of "1 to 5," with 1 representing "no problem," 2 "a slight problem," 3 "an obvious problem," 4 "a serious problem," and 5 "a very serious problem." (Tr. 115).

4

In February 2011, Kelly Bretz, A.H's special education teacher for math, reading, and English completed a Teacher Questionnaire. (Tr. 282).  A.H. was in the sixth grade and Ms. Bretz had known her for approximately one year. (*Id.*).  Ms. Bretz opined that A.H.'s current instructional level for her special education classes was second grade. (*Id.*).  In all of the activities related to acquiring and using information, Ms. Bretz indicated that A.H. suffered from either an "obvious problem" or a "serious problem." (Tr. 283).  Ms. Bretz also opined that A.H. "gets a lot of extra support in doing her assignments.  She can do independent activities, but I am always checking in on her to make sure she is understanding the material." (*Id.*).

A.H.'s sixth grade IED showed that she received special education services for reading, English, and math, but participated in general education classes for science, social studies, and all special classes. (Tr. 461).  The report indicated that A.H. had difficulty in reading comprehension and basic math; however, A.H. did very well in spelling due to her ability to memorize.  On the reading and math portions of the fifth grade Ohio Achievement Assessment, A.H. had scored in the "limited range" for both reading and math.  (*Id.*).

A.H. underwent the Woodcock-Johnson Tests of Achievement II in May 2011. (Tr. 478).  She demonstrated good recall of general spelling words, basic math calculations, and basic math facts.  However, she was extremely low in comprehension ability and math reasoning. (*Id.*).  A.H.'s teachers reported passing grades, noting A.H.'s willingness to try. (*Id.*).  In the fifth grade, A.H's final grades consisted of "Cs," "Ds," and "Bs." (Tr. 304).  In the sixth grade, A.H. received final grades of "As" and "Bs" in all subjects, except for science and social studies, where she received "Cs." (Tr. 303).

### C.  Medical Evidence

In October and November 2009, three state agency medical consultants conducted a review of the record and completed a joint Childhood Disability Evaluation Form. (Tr. 382-87). They opined that A.H. suffered from severe impairments which did not meet, medically equal, or functionally equal the listings. (*Id.*).  As to acquiring and using information, they noted that A.H. was in special education classes, and a teacher reported that A.H. needed extra time to learn new concepts, but worked well in small groups. (Tr. 384).  A.H. also required constant review for new concepts and one-step directions.  Although her IQ scores were low, the state agency consultants concluded A.H.'s adaptive functioning indicated she displayed borderline functioning, but she was not mentally retarded. They concluded that A.H. suffered from a marked limitation in this domain. (*Id.*).  In all other functional domains, the state reviewers found either no limitation or less than marked limitations. (Tr. 382-85).

In April and May 2010, two additional state agency consultants conducted an independent review of the updated record. (Tr. 432-34).  Their findings matched those of the 2009 state agency review.

### III.    SUMMARY OF THE ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant was born on December 30, 1997.  Therefore, she was a school-age child on August 14, 2009, the date the application was filed, and is currently an adolescent.

2.  The claimant has not engaged in substantial gainful activity since August 14, 2009, the application date.

3.  The claimant has the following severe impairments: cochlear otosclerosis; cataracts; language delays; and borderline intellectual functioning.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  The claimant does not have an impairment or combination of impairments that functionally equals the listings.

6.  The claimant has not been disabled, as defined in the Social Security Act, since August 14, 2009, the date the application was filed.

(Tr. 16-27) (internal citations omitted).

## IV.   STANDARD FOR CHILDHOOD SSI CASES

A child under age eighteen will be considered disabled if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i).  Childhood disability claims involve a three-step process evaluating whether the child claimant is disabled.  20 C.F.R. § 416.924.  First, the ALJ must determine whether the child claimant is working.  If not, at step two the ALJ must decide whether the child claimant has a severe mental or physical impairment. Third, the ALJ must consider whether the claimant's impairment(s) meet or equal a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1.  An impairment can equal the listings medically or functionally.  20 C.F.R. § 416.924.

A child claimant medically equals a listing when the child's impairment is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a).  Yet, in order to medically equal a listing, the child's impairment(s) must meet all of the specified medical criteria.  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990).

A child claimant will also be deemed disabled when he or she functionally equals the listings.  The regulations provide six domains that an ALJ must consider when determining whether a child functionally equals the listings.  These domains include:

      (1) Acquiring and using information;
      (2) Attending and completing tasks;
      (3) Interacting and relating with others;
      (4) Moving about and manipulating objects;
      (5) Caring for yourself; and,
      (6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1).  In order to establish functional equivalency to the listings, the claimant must exhibit an extreme limitation in at least one domain, or a marked impairment in two domains.  20 C.F.R. § 416.926a(d).

The regulations define "marked" and "extreme" impairments:

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than moderate" but "less than extreme."  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than marked."  "Extreme" limitation is the rating we give to the worst limitations.  However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning we would expect to find on standardized testing scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

During the evaluation of a child disability claim, the ALJ must consider the medical opinion evidence in the record.  20 C.F.R. § 416.927.  A treating physician's opinions should be given controlling weight when they are well-supported by objective evidence and are not inconsistent with other evidence in the record.  20 C.F.R. § 416.927(c)(2).  When the treating physician's opinions are not given controlling weight, the ALJ must articulate good reasons for

the weight actually assigned to such opinions. *Id*.  The ALJ must also account for the opinions of the non-examining sources, such as state agency medical consultants, and other medical opinions in the record.  20 C.F.R. § 416.927(e)(2)(i-ii).  Additionally, the regulations require the ALJ to consider certain other evidence in the record, such as information from the child's teachers, 20 C.F.R. § 416.926a(a), and how well the child performs daily activities in comparison to other children the same age.  20 C.F.R. § 416.926a(b)(3)(i-ii).

## V.    STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence and whether, in making that decision, the Commissioner employed the proper legal standards.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "Substantial evidence" has been defined by the Sixth Circuit as more than a scintilla of evidence, but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if a reasonable mind could accept the record evidence as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*  While the Court has discretion to consider the entire record, this Court does not determine whether issues of fact in dispute would be decided differently, or if substantial evidence also supports the opposite conclusion.  The Commissioner's decision, if supported by substantial evidence, must stand.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility.  *See Garner*, 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the

Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI.    ANALYSIS

Plaintiff challenges the ALJ's decision on two grounds. First, Hall contends the ALJ erred by finding A.H's impairments did not meet or equal the requirements of Listing 112.05, the listing for mental retardation. In the alternative, Plaintiff submits that the ALJ erred by failing to find that A.H.'s impairments functionally equaled listing level. For the reasons set forth below, neither of these objections warrants remand or reversal as substantial evidence supports the ALJ's ruling.

### A.  Listings 112.05C and 112.05D

Plaintiff maintains that contrary to the ALJ's conclusion, A.H.'s intellectual deficit, on its own, and in combination with her other limitations, meets or medically equal Listings 112.05C and 112.05D.

In relevant part, Listing 112.05 provides:

> 112.05 Intellectual Disability: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function.

20 C.F.R. Part 404, Subpt. P, App. 1, § 112.05.  In other words, to satisfy the requirements of the listing, the child's impairments must satisfy both the criteria set forth in the introductory paragraph and one of the six subsets set forth in paragraphs A through F.  Relevant to the case at hand, both subsections C and D require valid IQ scores falling with in a specific range.

Here, the ALJ explained that he considered Listing 112.05, but concluded that A.H. did not meet or medically equal its requirements. (Tr. 16).  More specifically, the ALJ observed that in April 2008, Plaintiff's IQ testing showed a verbal comprehension score of 53 and a full scale IQ score of 60.  Although these two scores aligned with the test score requisites of subsections C and D, the ALJ found A.H.'s scores were not valid, because other evidence of record demonstrated they were not an accurate assessment of her abilities. (Tr. 20).  As a result, A.H. failed to satisfy the requirements of subsections C and D.

Hall challenges the ALJ's conclusion that A.H.'s test scores were invalid.  She argues the ALJ failed to effectively review the test results, and additionally, the validity of the scores was not challenged by any medical or scholastic professionals.  These arguments lack merit.

The Sixth Circuit Court of Appeals has explained that an ALJ may evaluate the validity of IQ results while taking into account other factors and evidence. *See Brown v. Sec. of Health and Human Servs.*, 948 F.2d 268, 269 (6th Cir. 1991) ("[T]he ALJ is allowed some leeway to evaluate other evidence . . . when determining the validity of an I.Q. score.").  An ALJ may reject IQ scores that are contrary to substantial evidence. *See Courter v. Comm'r Soc. Sec.*, 479 F. App'x 713, 721 (6th Cir. 2012) (*citing Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)).

Here, the ALJ reasonably evaluated the record as a whole and articulated why the scores at issue did not accurately reflect A.H.'s IQ. (Tr. 20).  For example, the ALJ observed that since

the IQ test was performed, A.H. had succeeded in speech therapy, so much so, that she no longer

needed it. (*Id.*).   It is true that by March 2010, A.H.'s speech had improved to 98% capacity,

leading to the conclusion that her verbal comprehension had likely progressed. (Tr. 104).   The

ALJ further noted that A.H.'s grades showed improvement and she was on the honor roll, though

she was still in some special education classes. (Tr. 20, 43, 302-03).   Further, the ALJ pointed

out that A.H.'s non-academic functioning was not consistent with the test results. (Tr. 20).   For

example, the ALJ recounted that A.H. is able to complete her homework without significant

issue, though she required some assistance from her father. (Tr. 17, 44-45, 51).   A.H. would read

at home, and was able to watch and understand television shows and recount what occurred. (Tr.

18, 19, 190, 209).   These facts undermined the accuracy of the test scores and support the ALJ's

finding as to the validity of the scores.

The ALJ went on to question the accuracy of the scores on the basis that children's IQ

scores are generally unreliable.   While the ALJ's conclusion is rather broad, it does find some

support in this case.   According the regulations, how current test results are can affect whether

those results give an accurate assessment of the child's IQ.   Listing 112.00D(10) explains:

> IQ test results must also be sufficiently current for accurate assessment under
> 112.05. Generally, the results of IQ tests tend to stabilize by the age of 16.
> Therefore, IQ test results obtained at age 16 or older should be viewed as a valid
> indication of the child's current status, provided they are compatible with the
> child's current behavior. IQ test results obtained between ages 7 and 16 should be
> considered current for 4 years when the tested IQ is less than 40, and for 2 years
> when the IQ is 40 or above.

20 C.F.R. Part 404, Subpt P, App. 1, § 112.00(D)(10).

In the instant case, A.H. was only 10 years old when the IQ test results were obtained in

April 2008 and her tests scores were above 40.   The hearing on this matter was held on June 7,

2011, and the ALJ's decision was dated July 21, 2011, more than two years after A.H. was tested.  Consequently, the ALJ was correct in questioning the reliability of the scores.

Furthermore, in substantiating his opinion that Plaintiff did not meet or medically equal any subsection of Listing 112.05, the ALJ relied on the opinions of state agency consultants. (Tr. 16).  As the ALJ explained, multiple state agency experts opined that A.H. did not meet or medically equal any listing. (Tr. 16, 54-55, 382-87).[2]  The regulations recognize these consultants as "highly qualified" and "experts in Social Security disability evaluation," and thus, their medical opinions lend further support to the ALJ's ruling. 20 C.F.R. § 416.927(e)(2)(i).

Finally, Plaintiff argues that the ALJ erred by failing to evaluate A.H.'s condition under Listing 112.05D and remand is required for further analysis.  In support of her allegation, Hall asserts the ALJ did not mention this subsection in his hearing decision.  This argument is not well-taken.

Contrary to Plaintiff's assertion, the ALJ's opinion sufficiently articulates why the ALJ concluded A.H. did not meet or medically equal listing 112.05D.  In his analysis of Listing 112.05, the ALJ did not individually address subsections D or C. (Tr. 20).  Nonetheless, the ALJ addressed the listing as a whole, evaluating Plaintiff's verbal and full scale IQ scores, which if valid, would have met the IQ requirements of either subsection.  Because the ALJ determined that Plaintiff's scores were invalid, and the evidence did not otherwise show that her mental functioning was so impaired as to meet the IQ score requirement, the ALJ concluded that Plaintiff did not meet or medically equal the listing.  As a result, the ALJ's decision sufficiently

---

[2] Social Security Ruling 96-6p provides: "The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review. Other documents, including the Psychiatric Review Technique Form and various other documents on which medical and psychological consultants may record their findings, may also ensure that this opinion has been obtained at the first two levels of administrative review." 1996 WL 374180 at *3 (July 2, 1996).

articulates why the child did not meet subsection D. Accordingly, remand is not necessary for a more in-depth analysis.

### B. Functional Equivalence

Hall argues that the ALJ erred by finding that A.H. did not functionally equal a listing, because the evidence supports the opposite conclusion. More specifically, Hall contends that A.H. struggled with an extreme limitation in acquiring and using information, rather than a marked limitation as found by the ALJ. A review of opinion and record shows that substantial evidence supports the ALJ's finding that A.H. had no more than a marked limitation in the disputed domain.

The domain of acquiring and using information considers how well the claimant learns information and how well the claimant uses the information learned. 20 C.F.R. § 416.926a(g). Examples of limited functioning in this domain include: being unable to understand words about space, size, or time; having difficulty recalling important things learning in school yesterday; having difficulty solving mathematics questions or computing arithmetic answers; talking only in short, simple sentences and having difficulty explaining what you mean. 20 C.F.R. § 416.926a(g)(3). Importantly, "the regulation cautions that just because a person has the limitations described does not mean the person has an extreme or even a marked impairment." *Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 832 (6th Cir. 2009) (*citing* 20 C.F.R. § 416.926a(h)(3)). Thus, the fact that a claimant's behaviors may coincide with the examples in the regulations does not require a court to overturn the ALJ's finding. *Id.*

Plaintiff contends that A.H. struggled with an extreme limitation in this domain as shown by a variety of evidence. Among other evidence, Hall points to A.H.'s low IQ scores, achievement tests from 2008 showing significant deficits in application and comprehension (Tr.

14

132, 143), Ms. Sisko's report that A.H. had a very serious problem in the domain (Tr. 150), an IEP report from 2010 completed by Ms. Sisko indicating A.H.'s inability to comprehend her reading assignments and need to practice functional math skills (Tr. 234-36), and Ms. Bretz's report that A.H. functioned at the second grade level in reading, math, and written language, even though she was in the sixth grade. (Tr. 282).

The relevant question is whether the substantial evidence in the record supports the ALJ's decision. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).  If such support exists, the undersigned must affirm the ALJ's determination. *Id.*  While the evidence Plaintiff points to shows that A.H. suffered from notable limitations in this domain, it is not sufficient to undermine the substantial evidence that supports the ALJ's decision.

When evaluating A.H.'s ability in the domain of acquiring and using information the ALJ assessed that the child's teachers had reported at least some marked limitations in this area. (Tr. 21).  Although Ms. Sisko opined that A.H. suffered from "very serious problems," the ALJ gave greater weight to Ms. Speaker's opinion that A.H. suffered from only "obvious or serious problems." (Tr. 19-20).  The ALJ did so because Ms. Speaker was more familiar with A.H. than Ms. Sisko, and because no other teacher reported such severe limitations in this domain as Ms. Sisko. (Tr. 20).  Like Ms. Speaker, Ms. Bretz reported no very serious limitations.  The ALJ addressed A.H.'s low IQ scores, but noted that her adaptive functioning indicated that she was not as limited as the scores indicate. (Tr. 21).  For example, the ALJ recounted Ms. Speaker's report that A.H. could work close to grade level, when she chose to do so. (Tr. 19, 176).  Additionally, the ALJ's finding is consistent with the opinions of state agency consultants, who concluded that A.H. suffered from a marked limitation in the domain.  Accordingly, substantial

evidence supports the ALJ's conclusion that despite A.H. having problems in acquiring and using information, she did not have an extreme limitation.

## VI.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the Court AFFIRMS the decision of the Commissioner.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  June 5, 2014.